UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,       )<br>                                 )<br>          Plaintiff,             )<br>                                 )<br>vs.                              )<br>                                 )<br>                                 )<br>PHILLIP GAINES,                  )<br>                                 )<br>          Defendant.             )<br>_____) | Case No. 2:12-cr-00449-GMN-GWF<br><br>**FINDINGS &<br>RECOMMENDATIONS**<br><br>**Re: Motion to Suppress (#18)** |

This matter is before the Court on Defendant Phillip Gaines' Motion to Suppress Evidence Pursuant to *Franks v. Delaware* (#18), filed on March 22, 2013.  The Government filed its Response in Opposition to Defendant's Motion to Suppress (#22) on April 12, 2013.  The Government also filed Addenda, Docket Nos. 23-25, to its Response on April 15, 2013.  The Defendant filed his Reply to the Government's Response (#26) on April 18, 2013.   The Court conducted an evidentiary hearing in this matter on May 14, 2013.

**FACTUAL BACKGROUND**

Defendant Phillip Gaines is charged in the Indictment (#1), filed on December 4, 2012, with being a convicted felon in possession of ammunition in violation of 18 U.S.C. §922(g)(1) and §924(a)(2).  The indictment results from the discovery and seizure of ammunition in Defendant's residence pursuant to two search warrants issued on February 19 and 20, 2012.  The Defendant contends there were material misrepresentations or omissions in the affidavit in support of the first search warrant issued on February 19, 2012, and but for those misrepresentations or omissions, probable cause would not have existed to support the issuance of the search warrants.

. . .

On February 19, 2012 at 23:25 hours (11:25 P.M.), Detective Farrah Miles[1] of the Las Vegas Metropolitan Police Department ("LVMPD") applied by telephone to a Clark County, Nevada justice-of-the-peace for the issuance of a search warrant for the residence located at 5120 Mountain View Drive, Las Vegas, Nevada.  The application requested authorization to search for and seize "[a] .22 caliber semi-automatic pistol and any miscellaneous firearm pieces, ammunition, ammunition belts, magazines or clips, expended ammunition to include casings or bullets, and paper work showing the purchase, storage, disposition or dominion and control over any firearms, ammunition or any of the above listed items." *Government's Exhibit 1, Affidavit.*  Detective Miles' affidavit further stated: "The property here and before described constitutes evidence which tends to demonstrate that the criminal offense of Attempt Murder with a Deadly Weapon and Prohibited Person in Possession of a Firearm has been committed . . . ." *Id., pg. 2*.  The affidavit recited the following facts as demonstrating probable cause to support the issuance of the warrant:

> On February 6th, 2012 at about 1819 hours, Kevin McDermott, ... Victor Nagera, ... and Abraham Corrales, ... arrived in the area of Shawnee Avenue and Hussey Drive in McDermott's pickup truck. They had an on-going dispute with a Hispanic male subject, Fabian Lazaro, ... and were on the way to meet him for a fight when they noticed a possible silver Chevrolet Malibu or Impala, unknown license plate, occupied by multiple subjects.  McDermott stopped his vehicle at the intersection as did the silver car.  All occupants exited both vehicles to include Fabian Lazaro, his brother Jose Lazaro, ... and Merly Lazaro, ..., and an unknown Black male from the silver vehicle.  When the black male exited the silver car, he produced a handgun and shot both Nagera and McDermott.  He also shot twice at Corrales as Corrales attempted to flee on foot but did not strike him. All subjects in the silver car fled the scene and were not located at the time of the incident.  Nagera and McDermott were transported to University Medical Center Trauma for treatment regarding life-threatening injuries sustained during the incident, where Nagera subsequently underwent emergency surgery.  Multiple .22 caliber cartridge cases were located at the scene as was a brick with bloody fingerprints.  During the course of the investigation, two contacts with knowledge about the incident, Shawna Truman and Channa Truman, who are twin sisters, ... advised they were aware of a Black male subject who is an immediate neighbor, as well as a friend of the Lazaros on Mountain View Drive in Las Vegas.  His name is Phillip. Channa advised she lives on Mountain View Drive as well and has known all of the subjects for a long period of time.  On the night of

---

[1] Detective Miles has since married and her last name is now Edge.  She will be referred to in these findings as Detective Miles.

1
2
3
4
5
6
7
8
      the alleged incident prior to the shooting, she observed the Lazaro brothers and Gaines all standing, I'm sorry, and Phillip, all standing outside of the Lazaro residence, 5124 Mountain View Drive, in a huddle. When she became [sic] shooting incident and that a Black male was involved, she believed the Black male was Phillip, later determined to be Phillip Gaines, ... who is the Lazaros neighbor at 5120 Mountain View Drive. A photo lineup was conducted with victim McDermott during which he identified Gaines as the shooter during the aforementioned incident. In the investigating Detective's opinion, McDermott was determined to be the best witness. Neither Nagera nor Corrales could identify anyone from the lineups. Patrol located and arrested Gaines on February 18th, 2012 in regard to an unrelated Warrant and contacted Detectives regarding his custody status.

9     *Affidavit, pgs. 3-4.*[2]

10     Detective Miles stated she and another detective interviewed Mr. Gaines at the Clark County Detention Center on February 19, 2012, but he denied any involvement in or direct knowledge of the incident. Mr. Gaines informed the detectives he had resided at 5120 Mountain View Drive with his parents all his life, except for three years he spent in prison for a conviction of Robbery with a Deadly Weapon and Burglary While in Possession of a Deadly Weapon. *Id. pg. 4.* Detective Miles stated Mr. Gaines may have concealed the firearm used in the February 6, 2012 shooting in his residence. The officers sought authority to search the residence for the weapon as soon as possible, before Mr. Gaines was released from custody or could contact someone to remove the weapon from the residence. *Id. pg. 5.* Based on Detective Miles' telephone affidavit, the justice-of-the-peace authorized a nighttime search of the residence. *Id. pg. 6.*

    The officers did not find the .22 caliber handgun believed to have been used in the shooting incident during the search of residence. They did, however, find a .45 caliber handgun, a 9mm handgun and ammunition. The handguns, which were wrapped in a white t-shirt, were found in the attic crawl space above a hallway ceiling outside Defendant Phillip Gaines' bedroom. Miscellaneous rounds of .40 and .45 caliber ammunition were found in a white sock on top of Phillip Gaines' bedroom dresser. *Government's Opposition to Motion to Suppress (#22), Exhibit 5, Officer's Report.* Detective Miles applied for a supplemental telephonic search warrant to seize the

---

[2]The Court has omitted the birth dates of the individuals set forth in the affidavit.

firearms and ammunition on the grounds that Mr. Gaines was a convicted felon who was prohibited from possessing firearms or ammunition. The second search and seizure warrant was authorized by the justice-of-the peace who issued the initial search warrant. *Government's Opposition to Motion to Suppress (#22), Exhibit 6, February 20, 2012 Affidavit and Search Warrant.*

Defendant asserts that Detective Miles's affidavit in support of the issuance of the first warrant contained two false or misleading statements of material fact. The first alleged false or misleading statement concerns Kevin McDermott's photographic line-up identification of Defendant Gaines as the individual who shot him and Victor Nagera, and fired shots at Abraham Corrales. The second alleged false or misleading statement concerns the observations of witnesses Shawna Trueman and Channa Trueman.

**1.    Kevin McDermott's Identification of Defendant Gaines as the Shooter.**

According to the search warrant affidavit:

> A photo lineup was conducted with victim McDermott during which he identified Gaines as the shooter during the aforementioned incident. In the investigating Detective's opinion, McDermott was determined to be the best witness. Neither Nagera nor Corrales could identify anyone from the lineups.

*Affidavit, pg. 4.*

Mr. McDermott was interviewed by Detective M. Craig at 8:13 P.M. on February 6, 2012 (a few hours after the shooting) at the University Medical Center Trauma Unit. Mr. McDermott told Detective Craig he and his companions were going to Shawna Trueman's house when they encountered an automobile occupied by Fabian Lazaro and his associates. According to Mr. McDermott: "I got out of my truck. My friend got out of the truck. About five people got out of the car. The dude was screaming some--a black guy was screaming something. He shot my friend in the chest. I turned around to run. He shot me in the back of the head. And that -- that's all I remember." *Government's Exhibit 2, Voluntary Statement of Kevin McDermott on February 6, 2012, Bates pgs. 160-161.* Mr. McDermott then stated as follows:

> Q.  Okay. Do you know the black guy that shot you?
> A.  No, I don't.
> Q.  Okay. Have you seen him before?
> A.  One time.
> Q.  Okay, how long ago was that Kevin?

      . . .

    A.    Like two, maybe three months ago.
    Q.    Okay. Where did you see him?
    A.    In front of Fabian Lazaro's house.

      . . .

    Q.    Okay. Uh, can your describe the black male to me?
    A.    Uh, tall, dark, uh, not really.
    Q.    Did he have -- how about his hair?
    A.    Not really.
    Q.    Okay you didn't see that.
    A.    Uh-uh.
    Q.    How about his clothing?
    A.    I didn't -- I wasn't paying attention.

*Id. pg. 161,*

Later in the interview, Detective Craig asked Mr. McDermott:

    Q.    Okay. Would you -- would you recog-recognize the black guy if you saw him even though you can't describe him?
    A.    No.

*Id. pg. 164.*

Detective Craig also asked Mr. McDermott if there was any reason why the black guy shot him. Mr. McDermott responded that Jose Lazaro said "Shoot him. Shoot him." *Id. pg. 165.*

Mr. McDermott was presented with a photographic line-up of six young adult black males on February 6, 2012 at approximately 11:40 P.M. He identified a photograph of Defendant Phillip Gaines as the shooter. Mr. McDermott's handwritten statement on the photo line-up form stated:

> I'm pretty sure its #4. I got a some what look at him when he got out from the driver side back seat with the gun. He said you fucken want some an shoot my friend Victor in the chest. I turned to run an he shot me in the back of my head, then they started kicking me in my face calling me a little bitch.

I'm 60% shere.

*Defendant's Exhibit A.*

Mr. McDermott also viewed photo line-ups of other individuals involved in the shooting. He identified a photograph of Fabian Lazaro and stated he was 100% sure of that identification. *Defendant's Exhibit C.* In another photo line-up, he initially identified a photograph as that of Jose Lazaro, Fabian Lazaro's brother, as to which he was 60 percent sure. The photograph was actually of Merly Lazaro, another brother of Fabian Lazaro. *Defendant's Exhibit B.* Mr. McDermott then

5

1  correctly identified Jose Lazaro in another photo line-up, stating he was 100% sure of that
2  identification. *Defendant's Exhibit D.*
3      Detective Miles subsequently interviewed Kevin McDermott at the University Medical
4  Center on February 8, 2012 at 7:47 P.M. *Government's Exhibit 3, Voluntary Statement of Kevin*
5  *McDermott on February 8, 2012.* Detective Miles testified at the evidentiary hearing she was not
6  aware at the time she interviewed Mr. McDermott that Detective Craig had interviewed him two
7  days earlier. Mr. McDermott told Detective Miles he had been involved in a several months long
8  dispute with Fabian Lazaro over McDermott's relationship with Shawna Trueman, who was Fabian
9  Lazaro's former girlfriend and the mother of his children. *Id. Bates pgs. 172-73.* Mr. McDermott
10  stated Fabian Lazaro frequently made drunken threats to do bodily harm to McDermott, including
11  that he was going to kill or shoot McDermott. However, nothing previously had occurred and Mr.
12  McDermott considered Lazaro's threats to be just talk. *Id. pg. 173.* Under questioning by
13  Detective Miles, Mr. McDermott further stated as follows:

> Q. Did he make any comments about having someone else shoot you? Or did he, oh, or when he made the comments in past, was it always he, he was saying--
> A. Yeah, he told me, he told me that--I know, I know it was the black guy, but I don't know his name. His neighbor.
> Q. Yeah, we'll, we'll get to that. But, previously---
> A. Yeah, he was gonna have---
> Q. ---did he ever make any comments about---
> A. Yeah, he was gonna have him shoot me. His, his friend with a sho, his friend, he was gonna have his friend shoot me.
> Q. When did he say that?
> A. Uhm (clicking sound heard) it was like a month ago. I mean, eh, maybe a few weeks ago, I don't re, I don't remember. Like, it wasn't no, more than a month, prob'ly.

*Id. pg. 174.*

During the February 8, 2012 interview, Mr. McDermott described the shooting incident. *Id. pg. 179, 187.* Detective Miles asked him in reference to the black male who shot him and Mr. Nagera:

> Q. Do you know him?
> A. I seen him twice. Last night was eh, not last night, Monday night was the, eh, the second time I seen him. The first time I seen him was in Fane's mom's house. 'Cause I used to go over there and drink with them.
> Q. Mm-hmm. What's his name?

6

|   |   |   |
|---|---|---|
| A. | Who? | |
| [Q.] | The black guy. | |
| A. | I don't remember. I eh, I, honestly I couldn't tell you. I only met him one time, I mean. And like if I, I don't know if I picked him up, the right guy in a line up neither, I don't, I never, no--. | |
| Q. | So when he gets out of the tr, out of the car, does he already have the gun in his hand? | |
| A. | Yeah, he has it in his hand already. | |

*Id. pg. 188-189.*

Under further questioning by Detective Miles, Mr. McDermott stated the black male was in his "[l]ate thirties, maybe," was 6' 2" to 6' 3" tall and weighed "about 150, if that." He had dark brown skin. Mr. McDermott did not remember if he had hair and did not recall what he was wearing. *Id. pg. 188.* Mr. McDermott stated he was seven to eight feet away from the black male when he began shooting. *Id. pg. 192.*

**2.  Information in the Affidavit Regarding Shawna and Channa Trueman's Knowledge of Incident and Identity of Defendant as the "Shooter."**

Defendant also argues the information in Detective Miles' affidavit regarding Shawna and Channa Trueman was misleading. The affidavit states:

> During the course of the investigation, two contacts with knowledge about the incident, Shawna Truman and Channa Truman, who are twin sisters, ... advised they were aware of a Black male subject who is an immediate neighbor, as well as a friend of the Lazaros on Mountain View Drive in Las Vegas. His name is Phillip. Channa advised she lives on Mountain View Drive as well and has known all of the subjects for a long period of time. On the night of the alleged incident prior to the shooting, she observed the Lazaro brothers and Gaines all standing, I'm sorry, and Phillip, all standing outside of the Lazaro residence, 5124 Mountain View Drive, in a huddle. When she became [sic] shooting incident and that a Black male was involved, she believed the Black male was Phillip, later determined to be Phillip Gaines, ... who is the Lazaros neighbor at 5120 Mountain View Drive.

On the date of the shooting, Shawna Trueman resided at 6208 Shawnee Avenue, Las Vegas, Nevada. The shooting occurred at the intersection of Shawnee Avenue and Hussey Street which is near her home. Shawna's sister, Channa Trueman, resided with their parents on Mountain View Drive, near the homes of both Fabian Lazaro and Phillip Gaines. Mountain View Drive is located

. . .

. . .

7

approximately two miles east and south from the location of the shooting.[3]

Detective S. Mendoza conducted a recorded interview of Shawna Trueman on February 6, 2012 at 9:12 P.M. During the interview, Shawna described the dispute between Fabian Lazaro and Kevin McDermott, and also between Fabian Lazaro and Victor Nagera, which had been ongoing prior to February 6, 2012. Fabian Lazaro was angry at Victor Nagera because he had reportedly struck Shawna and Fabian's five year old son. Prior to the shooting, Shawna Trueman had picked up Victor Nagera and his brother-in-law, Abraham, in her automobile. While Shawna was filling the vehicle with gasoline at a service station, Fabian Lazaro called Shawna's cell phone which Nagera answered. Shawna overheard the discussion or argument between Nagera and Fabian, and that they wanted to fight. *Shawna Trueman's Voluntary Statement, pg. 281*. She then took Nagera and Abraham to a 99¢ Store located at Charleston and Decatur Boulevards where Kevin McDermott picked them up. *Id. pg. 291-93*. Shawna was aware that McDermott, Nagera and Abraham intended to go to Fabian Lazaro's house to talk or fight with him. *Id.*

After dropping Nagera and Abraham off at the 99¢ Store, Shawna telephoned her sister, Channa and "told her to look out the window to see what's happening." *Id. 291-92*. Channa told her "[s]he seen Favian,[4] Merly, Jose, and ... Favian's nephews Junior and Jornelo get in a car and leave." *Id. pg. 294*. Channa also indicated a friend of Fabian named Victor Robidon may also have been with the group. *pg. 298*. Shawna further stated that she drove to the vicinity of her mother's house on Mountain View Drive to pick up her children, but did not go to the house itself because she didn't want to be seen by Fabian or his relatives. Channa left their mother's house, and brought the children to Shawna's location. *pg. 295*. Channa told Shawna she drove by Fabian's house and saw Nagera talking to Fabian's mother. *Id.*

---

[3]The Court takes judicial notice of the respective locations of the streets as shown on the Google Maps website, *see* http:// maps.google.com. *See United States v. Perea-Rey*, 680 F.3d 1179, 1182 n. 1 (9th Cir. 2012) ("We take judicial notice of a Google map and satellite image as a 'source [ ] whose accuracy cannot reasonably be questioned,' at least for the purpose of determining the general location of the home. Fed.R.Evid. 201(b).")

[4]Shawna apparently pronounces Fabian with a "v," instead of a "b."

Shawna Trueman then drove back toward her home on Shawnee Avenue. *pg. 286-287*. Upon arriving in the vicinity of her house, Shawna observed police cars. As she approached her house, she also saw Kevin McDermott and Victor Nagera who had been shot. *pg. 298*. Channa also arrived at Shawna's house. Channa asked her what happened and Shawna told her what she observed. *pg. 299*. Shawna further stated that when she arrived at the house she heard "Abraham screaming really loud, saying that there was a red car and five Mexican dudes. So that was why I knew it was them that did it." *pg. 299*.

The detective then questioned Shawna as follows:

> JP. And you didn't tell your sister that, ah Phillip shot them?
> A. He said a black dude was there.
> . . .
> Q. Did you say Phillip shot them to your sister?
> A. Well they said black dude so I know it was a black dude. Favian told me already that, um -- um he would have Phillip shoot my boyfriend over him and I said really you're gonna be that stupid and let some guy take some other guys life just -- just for you.
> Q. Do you know – Do you know Phillip?
> A. Yeah I grew up with him.
> Q. You grew up with him. What's his last name?
> A. Gaines.
> Q. Okay so did you tell your sister that Phillip is the one that shot, ah Victor and -- and, ah Kevin?
> A. Yeah.
> . . .
> Q. How do you know that Victor [sic] was the shooter of -- of or is the one that shot Kevin?
> A. I don't know I just -- they said it was a black dude and five Mexicans in a red car and --and the only --
> Q. So you just assumed.

*Shawna Trueman's Voluntary Statement, pg. 299-300.*

Later in the interview, Shawna stated as follows:

> Q. So just to clarify did you tell your ... sister -- Channa did you tell her that Phillip shot them or what did you exactly say to her?
> A. Well I told her Phillip shot them because Abraham said that there was a black dude so I'm kind of figuring it was, ah Phillip because they don't have another tall black guy that they hang out with.
> Q. Okay but you didn't actually see Phillip shoot anyone.
> A. No.

*Id. pg. 328.*

9

Shawna Trueman further stated that prior to the shooting, she observed Fabian, Merly, Jose and Junior, a/k/a Loriano Lazaro, standing outside their vehicle in front of her house. *Id. pgs. 302-303*. The detective asked Shawna:

> Q. Did you happen to see Phillip out there?
> A. It's too dark I can't say; it was dark out there.

*Id. pg. 303*.

The detective then pressed Shawna to be truthful and forthcoming regarding what she knew about the shooting. *pgs. 303-305*. Shawna repeated essentially the same story with some added detail about the dispute between Nagera and Fabian. She also stated that after Channa delivered her son to her, she, Shawna, drove back toward her house. She drove down Hussey Street and saw Merly Lazaro's red Impala parked on Hussey Street. *pg. 316*. She then saw Fabian "walking the corner." *pg. 318*. She also saw Merly Lazaro, Jose Lazaro, and Loriano Lazaro outside the vehicle. She didn't see anyone else there. *Id.* The detective asked her if she saw anyone in the car and she responded no. *Id.* Shawna stated Fabian and the others saw her, so she drove away on some "back roads" in case they followed her. When she concluded that they were not following her, she drove back toward her house, at which time she observed the police. *pg. 319*. Before arriving back at her house, Shawna also called Nagera and McDermott and told them Fabian and his associates were at her house. *pgs. 319-320*.

The detective asked Shawna if she heard gunshots as she approached her house. She responded:

> A. No I didn't. I didn't hear no gunshots. I didn't even -- I didn't even realize nobody was shot until I actually pulled up and I seen Victor laying on the floor and then I seen Kevin laying on the -- his truck. Because they're -- they're not known to have any guns. I don't I -- since I've known them I haven't known that they had any guns.
> Q. Okay is --
> A. But Favian had made a comment to me that Phillip did have a gun and he would shoot Kevin because Kevin won't leave me alone.
> Q. And did he make that today -- that comment today?
> A. No he made it a week ago.

*Id. pgs. 320-321*.

. . .

10

1	The detective also asked Shawna if McDermott knew Phillip Gaines. She responded "No,
2	not that good," and that McDermott might have seen him twice. *pg. 326.*
3	Channa Trueman provided a handwritten voluntary statement to the police on February 6,
4	2012 which stated, in part, as follows:

> My sister Shawna who resides at address where incident happen, has a guy she is seeing named Kevin which her kids' dad (Fabian) doesn't like. On the phone Kevin and Fabian exchanged words with each other. . . . Kevin and Victor went down to Fabian's house which is on Mountain View and wanted to fight Fabian. Well they never came out except for Fabian's mom which started talking to Kevin. Kevin and Victor ended up leaving their house and drove over to my sister's house. But before Kevin drove to his house, I came home (and I live 5 houses up from Fabian) and seen Fabian, Merly, Jose, Phillip down the street gathering in a circle discussing what they were going to do. So I guess they decided to come to my sisters house to wait for Victor and Kevin to come back to my sisters house. . . .

*Government's Opposition (#22), Exhibit 3, Voluntary Statement of Channa Trueman.*

The remainder of Channa Trueman's written statement recounts what she was informed occurred at her sister's house.

Channa Trueman was also interviewed by the police and Defendant attached a portion of the transcript of the interview as an exhibit to his motion. In the interview, Channa Trueman stated she observed Fabian Lazaro and his brothers in a group sitting or standing in the middle of the street on Mountain View prior to the incident. In regard to Phillip Gaines, Channa stated as follows:

> A.	I didn't see him over there in the group at the time.
> Q.	You didn't see him in the group so --
> A.	Um I seen him when I -- when I came back home from the Boys and Girls Club --
> Q.	Okay.
> A.	-- and I had noticed him sitting in the circle in between each I mean our house and his house.
> Q.	Okay.
> A.	Ah they were sitting or standing in the middle of the street, you know gath --or like probably, you know discussing what they were gonna do.
> Q.	He -- so Phillip was with Lazaro brothers and Victor.
> A.	I believe so; I think I seen him over there.

*Motion to Suppress (#18), Exhibit G, Channa Trueman Voluntary Statement pg. 356.*

. . .

11

**DISCUSSION**

In *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that a defendant may challenge the validity of a search warrant affidavit under the Fourth Amendment if he or she makes a substantial preliminary showing that (1) the affidavit contains intentionally or recklessly false statements and (2) the affidavit purged of its falsities would not support a finding of probable cause. *See also United States v. Martinez-Garcia,* 397 F.3d 1205, 1215 (9th Cir. 2005), *citing United States v. Reeves,* 210 F.3d 1041, 1044 (9th Cir. 2000).

In initially deciding whether a defendant is entitled to an evidentiary hearing, *Franks* states:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

438 U.S. at 171.

*Franks* further stated that if the defendant makes a substantial showing that the affidavit contains intentionally or recklessly false statements, "and if, when the material that is the subject of the alleged falsity is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id.,* at 171-172. On the other hand, if the remaining content is insufficient to support probable cause, then the defendant is entitled to an evidentiary hearing. *Id.* At such hearing, the defendant has the burden of proof by a preponderance of the evidence to establish that the false statements were deliberately made or were made with a reckless disregard for the truth. *United States v. DeLeon*, 955 F.2d 1346, 1348 (9th Cir. 1992).

The omission of relevant facts from the affidavit may also constitute grounds for an evidentiary hearing. In *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985), the court stated as follows:

> The use of deliberately falsified information is not the only way by which police officers can mislead a magistrate when making a probable cause determination. By reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw. To allow a magistrate to be misled in such a manner could denude the probable cause requirement of all real meaning.

*Stanert* also states that in determining whether a defendant is entitled to an evidentiary hearing, "[c]lear proof of deliberate or reckless omission is not required. *See United States v. Chesner,* 678 F.2d 1353, 1362 (9th Cir. 1982). Such proof is reserved for the evidentiary hearing." 762 F.2d at 781. All that is required for an evidentiary hearing to be granted, is that the defendant make a substantial showing that the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading. *Id.* Once a hearing is granted, however, the defendant has the burden of proving that the affiant intentionally or recklessly omitted material facts from the affidavit. In *United States v. Senchenko,* 133 F.3d 1153, 1158 (9th Cir. 1998), the court stated that recklessness is established by showing that the affiant had a "high degree of awareness of the probable falsity" of the statements.

      To sustain a *Franks* challenge to the search warrant, the defendant must also show that the affidavit, purged of its falsities or supplemented by the omitted facts, would not be sufficient to support a finding of probable cause. *Stanert,* 762 F.2d at 782, citing *Franks*, 438 U.S. at 171-72, 98 S.Ct. at 2684. "The effect of the misrepresentations and omissions is considered cumulatively. *Id.* The court must therefore determine "whether the affidavit, once corrected and supplemented, would provide a magistrate with a substantial basis for concluding that probable cause existed." *Id. See also United States v. Jawara,* 474 F.3d 565 (9th Cir. 2007).

      Probable cause is determined by the totality of the circumstances. *Stanert,* 762 F.2d at 778. It is a fluid concept which turns on the assessment of probabilities in particular factual contexts, not readily or even usefully reduced to a neat set of legal rules. *Id.* citing *Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 2328-29, 76 L.Ed.2d 527 (1983). "[P]robable cause means 'fair probability,' not certainty or even a preponderance of the evidence. In short, a magistrate judge is only required to answer the 'commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place' before issuing a search

1   warrant." *United States v. Gourde,* 440 F.3d 1065, 1069 (9th Cir. 2006).

2   Detective Miles' affidavit stated that "[a] photo lineup was conducted with victim McDermott during which he identified Gaines to be the shooter during the aforementioned incident." This statement was critical to a finding of probable cause because the only other information in the affidavit connecting Defendant Gaines to the "shooter" was the information provided by Shawna Trueman and Channa Trueman that Defendant Gaines was an immediate neighbor and friend of the Lazaros and that prior to the shooting Channa Trueman observed the Lazaro brothers and Defendant Gaines all standing outside of the Lazaro residence, at 5124 Mountain View Drive in a huddle.

The statement that Mr. McDermott identified Defendant Gaines as the shooter was misleading because, without more, it suggested that Mr. McDermott's identification of Mr. Gaines was reliable. During his initial interview by Detective Craig on February 6, 2012, however, Mr. McDermott, in response to the detective's question whether he would be able to recognize the "black guy if you saw him even though you can't describe him," stated "No." On the photo lineup form, itself, Mr. McDermott stated that he was "pretty sure its #4." He stated that he "got a some what look at him," and that he was 60 percent sure. By comparison, Mr. McDermott was able to identify photographs of Fabian Lazaro and Jose Lazaro with 100 percent certainty. However, he misidentified a photograph of Merly Lazaro as Jose Lazaro and stated on that misidentification that he was 60 percent sure. Finally, on February 8, 2012, Detective Miles asked Mr. McDermott if he knew the black male who shot him and Mr. Nagera. Mr. McDermott responded that he had seen the black male once before the shooting at "Fane's mom's house." When asked what the black male's name was, Mr. McDermott stated "I don't remember. I eh, I, honestly couldn't tell you. I only met him one time, I mean. And like if I, I don't know if I picked him up, the right guy in a line up neither, I never, no --."

This information cast doubt on the reliability of Mr. McDermott's photo lineup identification of Defendant Gaines and should have been included in the affidavit. During the evidentiary hearing, Detective Miles could not state why she did not include the information in the affidavit. The only arguable reason given was that Detective Miles was in somewhat of a rush to

obtain the telephone search warrant before Mr. Gaines was released from jail and was able remove, or have someone else remove, the sought after firearm from his residence.  The police officers, however, had eleven days from when Detective Miles interviewed Mr. McDermott to prepare the search warrant application and affidavit.[5]  It is not reasonable to believe that Detective Miles and the other detectives involved in the investigation did not have adequate opportunity to fully describe the circumstances pertaining to Mr. McDermott's identification of Mr. Gaines in the affidavit.

The statements in the affidavit regarding the information provided by Shawna Trueman and Channa Trueman were neither false nor misleading.  The affidavit does not state or imply that either Shawna or Channa actually witnessed the shooting and had direct knowledge that Defendant was the shooter.  Instead, the affidavit correctly reported that Shawna and Channa were aware that Defendant Gaines was an immediate neighbor and friend of the Lazaros.  The affidavit also correctly reported that Channa Trueman stated she observed the Lazaro brothers and Phillip Gaines standing outside the Lazaro residence prior to the shooting.  The affidavit actually omitted significant information that supported an inference that Phillip Gaines was the shooter.  Shawna informed Detective Mendoza that Fabian Lazaro told her that he would have Phillip shoot her boyfriend, and that Fabian Lazaro had stated Phillip had a gun and would shoot Kevin because Kevin wouldn't leave her alone.  *Shawna Trueman Voluntary Statement, pgs. 300, 320-21.*  The affidavit also omitted Mr. McDermott's statement that Fabian Lazaro had told him that he was going to have his friend shoot McDermott.

A correctly drafted affidavit would have stated that immediately prior to the shooting, Fabian Lazaro, Jose Lazaro, and Merly Lazaro exited from a silver vehicle.  A black male then exited from the same vehicle, produced a handgun and shot Mr. Nagera and Mr. McDermott, and

---

[5] Detective Miles testified that Mr. McDermott's statement that he didn't know if he had picked the right guy, appeared to be motivated by a desire to deal with Mr. Gaines independently of the police.  To the extent that Detective Miles believed this, her opinion of Mr. McDermott's motives could have been included in the affidavit for the judge's consideration.

also shot at Abraham Corrales.  The affidavit would have further stated that Defendant Phillip Gaines, a black male who had previously been convicted for robbery with a deadly weapon and burglary while in possession of a deadly weapon, was a neighbor and friend of the Lazaros on Mountain View Drive and that within approximately an hour before the shooting, Channa Trueman observed the Lazaro brothers and Phillip Gaines together on Mountain View Drive.  The affidavit would have stated that Kevin McDermott identified a photograph of Defendant Gaines in a photo line-up as the person who shot him.  The affidavit would also have stated, however, that Mr. McDermott was only 60 percent sure of his identification of Defendant in the photo line-up.  The affidavit would also have included the information that Mr. McDermott stated he had seen the individual who shot him on one previous occasion, but that prior to the photo line-up, he also stated he would not recognize the individual if he saw him again.  The affidavit would have also included the information that two days after the photo line-up Mr. McDermott stated he that didn't know if he had picked the right person in the photo line-up.  The corrected affidavit would have also included the information that Shawna Trueman told the detective that a few weeks prior to the shooting, Fabian Lazaro told her that Phillip Gaines had a gun and that Fabian Lazaro was going to have Phillip Gaines shoot Kevin McDermott.  The affidavit would have also included the information that prior to the shooting, Fabian Lazaro told Mr. McDermott that he was going to have his friend shoot him.

Thus, although the corrected affidavit would have made clear that Mr. McDermott's identification of Defendant Gaines as the shooter was subject to significant doubt, it would also have contained other information, omitted from the original affidavit, that supported the inference that Defendant Gaines was the shooter.

## CONCLUSION

The affidavit in support of the initial warrant to search Defendant Gaines' residence omitted material information that cast substantial doubt on the reliability of  Kevin McDermott's identification of Mr. Gaines as the shooter.  The affidavit, as corrected to include all relevant and material information known to the police, however, would still have provided probable cause to believe that Defendant Gaines was the shooter and that the firearm used in the shooting would

possibly be found in his residence. Accordingly,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Defendant Phillip Gaines' Motion to Suppress Evidence Pursuant to *Franks v. Delaware* (#18) be **denied**.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 19th day of June, 2013.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge